CITY OF LaMOURE, a municipal corpora-
tion, and C M Corporation, d/b/a Colonial
Manor of LaMoure, Appellants,

v.

STATE HEALTH COUNCIL and State De-
partment of Health of North Da-
kota, Appellees.

Civ. No. 8917.

Supreme Court of North Dakota.

Dec. 4, 1973.

Rausch & Chapman, Bismarck, for appellants.

Morris A. Tschider, Special Asst. Atty. Gen., Bismarck, for appellees.

VOGEL, Justice.

In this appeal we construe legislation relating to hospital construction and operation which became effective during the period when the appellants, the City of LaMoure and C M Corporation, were in the process of planning and beginning construction of a hospital for long-term care.

The crucial statute, Section 23–17.2–04, N.D.C.C., effective July 1, 1971, reads:

"No hospital or related medical facility shall be constructed or expanded and no new medical care service shall be instituted after the effective date of this chapter except upon application for and receipt of a certificate of need as pro-vided by this chapter. This chapter shall not apply to any facility that has submitted to the state health department preliminary architectural plans for expansion or remodeling during the calendar year 1970 and which plans are followed up by the awarding of a contract for construction by December 31, 1971."

This statute is part of a statutory modification of prior law regulating the construction and operation of hospitals and related institutions. The older law is found in Chapter 23–16, N.D.C.C., and the body of new law is found in Chapter 23–17.2, N.D.C.C.

The facts are before us by stipulation, including affidavits stipulated into evidence.

On April 29, 1972, the plaintiff C M Corporation, doing business as Colonial Manor of LaMoure, filed with the State Health Council and the State Department of Health an application for a license to operate a hospital for long-term care. On June 6, 1972, that application was denied. Thereafter, the plaintiff sought an alternative writ of mandamus in the district court requiring the defendants to grant C M Corporation a license to operate a hospital under Chapter 23–16 of the North Dakota Century Code or show cause why such a license should not be granted. After a hearing, the trial court quashed the writ which it had temporarily issued, and it is from the order quashing the writ that the plaintiffs appeal.

We shall hereinafter refer to the plaintiffs in the singular as C M Corporation and the defendants in the singular as the Department of Health.

We note at the outset that C M Corporation applied under former law for a license and that the Department of Health denied the application, likewise before the new law went into effect, asserting then, as now, that C M Corporation must comply with the new law, even though it was not then in effect.

We first will consider whether the new statute is applicable to C M Corporation.

■ C M Corporation asserts that the provisions of Section 23–17.2–04 do not apply to it, by its terms and by the terms of Section 23–17.2–02, subsection 3, defining "construction" as follows:

"'Construction' means the *proposed* construction of any new facility or proposed program which would expand the scope of service, or any increase of bed count. However, construction shall not include the temporary increase of bed count by reason of an emergency not to exceed sixty days, or by changes required by state or federal health and safety regulatory bodies." [Emphasis added.]

C M Corporation asserts that construction was proposed in 1969, long before the effective date of the new law, and was actually commenced on the project site before July 1, 1971, the effective date of the Act. Our examination of the record supports this contention. We find that a feasibility study was ordered in March 1969; a city council resolution to construct the building and issue bonds was approved on April 10, 1969; a meeting was held on May 2, 1969, to form a local development corporation; on June 3, 1969, articles of incorporation were issued by the Secretary of State, for LaMoure Enterprises, Inc.; on July 11, 1969, an architect was engaged and instructed to draw preliminary plans; from July 11, 1969, to February of 1970, attempts were made to sell bonds at a favorable interest rate, without success, because of the state of the bond market at that time; in February of 1970, the possibility of a loan from the Small Business Administration was explored, and the Small Business Administration issued a requirement that a certificate of need from the Department of Health be obtained (under former law), and a meeting was held with representatives of the Department of Health.

The Department of Health would give a certificate of need for only twenty-two beds, which was less than the sixty beds planned, so the local corporation decided to attempt to sell bonds again. In February or March of 1970, an oral agreement was entered into between C M. Corporation and the City of LaMoure to construct and lease a sixty-bed nursing home, with rentals to be sufficient to retire revenue bonds to be issued for construction costs. Between March 1970 and February 1971, attempts were made to sell the bonds, and verbal assurance was obtained that one bond company would underwrite the project. On February 22, 1971, a resolution of the city council of LaMoure was passed accepting the written proposal of the bond company. On the same day, the city council passed its second resolution (the first being on April 10, 1969) approving the entire project. On February 1, 1971, land was purchased for the building site, and on March 15, 1971, formal authorization to a construction company to work with the architect and develop a final construction price was given. On March 19, 1971, the city attorney requested a topographical survey of the building site, and four days later the representatives of the construction company met with officials of the Department of Health, presenting several copies of preliminary architectural plans of a similar home built at Ipswich, South Dakota, for the purpose of determining whether such plans would meet North Dakota code requirements. The construction company representatives left with a list of twenty-three recommendations of the Department of Health which would make the plans acceptable. On March 26, 1971, the contractor made application for a Class A contractor's license in North Dakota, and on April 1, 1971, the city council gave informal approval of construction plans. On the same day, a lease was entered into, pursuant to the oral agreement of more than a year previously, between the City and C M Corporation. On April 12, 1971, the deed to the land site was obtained. Preliminary plans based on the South Dakota plans were presented to the Depart-

ment of Health in April of 1971. On May 3, 1971, the deed to the site was recorded.

On May 10, 1971, another meeting was held with a representative of the Department of Health, at which time he told the city officials of the passage of Senate Bill 2307, which now is Chapter 23–17.2, N.D. C.C., and intimated that the City would be required to obtain a certificate of need under that law, which, as we have stated, was not to go into effect until July 1, 1971.

On May 13, 1971, at a meeting in St. Paul, Minnesota, the bond deal was consummated, the mortgage and indenture of trust were signed as of April 1, 1971, and a lease was signed between the City and C M Corporation. The following day, the financing statement was filed in the office of the Secretary of State pursuant to law. On May 19, 1971, the contractor received its Class A contractor's license from the State, and on the same day, the architect had another meeting with the Department of Health and again reviewed the preliminary plans for the structure.

On May 21, 1971, since it was apparent that there was a dispute between the City and the Department of Health as to the applicability of the new law—even though it was not yet in effect—the city attorney directed a letter to the Attorney Genral in which he asserted that "construction," as defined in the new law, had commenced, and that the law therefore was not applicable by its terms. (In an opinion dated June 21, 1971, the Attorney General's office very properly replied, in effect, that if "construction," as defined in the new law, was under way, of course the new law would not apply, but whether the project was instituted prior to the effective date of the Act was a question of fact rather than a question of law.)

On May 24, 1971, an architect connected with the Department of Health wrote a letter suggesting revisions in preliminary plans. On June 1, 1971, the construction contract for the new building was execut-

ed, and on June 14, 1971, the first earthmoving on the project commenced.

By July 1, 1971, 100 yards of dirt fill had been hauled, the excavation for footings had been completed, and 595 linear feet of forms for pouring concrete for the footings had been completed.

On June 30, 1971, the architect signed a letter of submission of final plans and specifications to the Department of Health, the State Fire Marshal, the State Plumbing Inspector, and the State Electrical Inspector for final approval. The record indicates that he hand-carried these documents to the various offices. The copy delivered to the Department of Health contains a stamp indicating that it was received on July 1, 1971.

On July 6, the Fire Marshal approved the plans, and on the same day, the Electrical Board approved the plans with minor modifications. On July 7, 1971, the plans were finally approved by the Department of Health, subject to slight changes and with a disclaimer of waiver of any requirements of the new statute.

We believe that the foregoing chronology shows that the sixty-bed nursing home in question was not only "proposed" but was actually under way on July 1, 1971, and that Chapter 23–17.2 therefore, by its terms, does not apply to the project in question.

If this law were interpreted to be retroactive in its operation, very serious questions of constitutional law would arise. By following the plain meaning of the statute, such problems are avoided.

■ The Department of Health claims that, even if we hold that construction was commenced, the project still cannot be approved because a certificate of need is likewise required by Section 23–17.2–04 for "new medical care service" and that neither the City nor C M Corporation had commenced a new medical care service by July 1, 1971, the effective date of the Act, nor did they apply for a certificate of need

under the Act after that date. We believe this contention is untenable for at least two reasons:

First, Section 23–17.2–04 uses the conjunctive "and" in requiring that "no hospital or related medical facility shall be constructed or expanded *and* no new medical care service shall be instituted . . ." We believe the intention of the framers of the statute was that the old law should apply to construction and new medical care services if construction was commenced prior to the effective date of the Act.

■ Second, we believe the reference to "new medical care service" was intended to cover situations where a medical care facility was being converted to a different type of medical care, such as conversion of an old hospital into an alcoholic or psychiatric treatment center, or the like, or a situation where an existing hospital was adding new facilities or programs not covered by existing licenses from the Department of Health. This interpretation is fortified by the language of the public policy statement of the statute, found in Section 23–17.2–01, subsection 2, which declares it to be the public policy of the State:

"That the general welfare and the protection of the lives, health, and property of the people of this state require that the type, level, and kind of care needed in proposed construction *or expansion of services in hospitals* and related medical facilities within this state be subject to review and evaluation before commencing construction in order that proper facilities are made available for such care, that proposed new *or expanded medical facilities* provide, within the economic means of this state, the type, level, and kind of care necessary for the continued well-being and comfort of the patients of such hospitals and related medical facilities and to ensure that medical facilities are not constructed *or services expanded* which exceed the needs of patients or of persons in the area to be served." [Emphasis added.]

We interpret the reference in Section 23–17.2–04 to "new medical care service" to be intended to be equivalent to the triple reference to "expansion of services in hospitals" or equivalent terms in 23–17.2–01, subsection 2, quoted above.

■ The Department of Health finally claims that, even if the new law did not apply to the facility in LaMoure it still had the right to refuse a license under the old law, and that it did so.

As stated earlier, C M Corporation made an application for a license under the old law to conduct a hospital for long-term care on April 29, 1972, and on June 6, 1972, the application was denied. Both dates, of course, precede the effective date of the new law, July 1, 1972.

The parties stipulated "That Allegation III of the Petition is true except that respondents do not concede that the Application for a License to conduct a hospital for long term care was wrongfully refused or that the applicant was exempt from the Certificate of Need requirement set forth in Section 23–17.2–04 of the North Dakota Century Code; or that competent proof of exemption was submitted."

The Allegation III of the petition referred to in the quoted portion of the stipulation reads as follows:

"That on April 29, 1972, Plaintiff CM Corporation duly made application for a license to conduct a hospital for long term care (nursing home) to the North Dakota State Department of Health subject to the regulations of Chapter 23–16 of the North Dakota Century Code; that Plaintiff CM Corporation has complied with all of the provisions and requirements of Chapter 23–16 and the regulations and standards adopted thereunder by the State Health Council; that Plaintiff CM Corporation has made full disclosure of corporate ownership in compliance with the requirements of Public Law 90–248; and that Plaintiff CM Corporation has duly submitted compe-

tent proof in said application that it was exempt from the Certificate of Need requirement as set out in Chapter 23–17.2 of the North Dakota Century Code, said legislation becoming effective July 1, 1971."

As we read paragraph II of the stipulation and paragraph III of the petition, we conclude that the parties have stipulated that plaintiff C M Corporation duly made application for a license under the former law, Chapter 23–16, N.D.C.C., and that C M Corporation complied with all of the provisions and requirements of Chapter 23–16 and the regulations and standards adopted thereunder by the State Health Council.

Paragraph IV of the stipulation states:

"That on the 6th day of June, 1972, the State Health Council informed the general counsel for CM Corporation that compliance with the Certificate of Need statute would be required and that the license would not be issued."

Since the parties stipulated that the requirements of the former law were complied with, there was no valid reason for the refusal of the license under the former law prior to the effective date of the new law. Certainly the State Department of Health had no right, on June 6, 1972, to refuse a license under the law then existing and insist upon compliance with a law not then in effect. Yet that is what the State Health Council did.

The Department of Health asserts that the second sentence of Section 23–17.2–04, quoted *supra*, specifies a single exception to the application of the new law, and that the doctrine of ejusdem generis requires that no other exception be allowed. It further asserts that the City's interpretation of the law would require the declaration that another exception exists. We find, however, that the maxim of ejusdem generis is inapplicable, since the plain language of the first sentence of 23–17.2–04 excludes the plaintiffs from its operation and the language of the second sentence,

creating an exception as to facilities subject to the first sentence, does not apply to the plaintiffs.

We conclud that the construction of the LaMoure facility was not only planned but commenced before the effective date of the new statute; that the plaintiffs had complied with the provisions of the former statute and were entitled to the license applied for not later than June 6, 1971; that the rejection of the application was unauthorized; and that the trial court erred in quashing the alternative writ.

The order of the trial court is therefore reversed and the action is remanded to the district court for further proceedings consistent with this opinion.

ERICKSTAD, C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.